IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

TIA JOHNSON,

        Plaintiff,

vs.                                           No. 09-2049-STA/tmp

MEMPHIS CITY SCHOOLS,

        Defendant.

---

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(DOCKET ENTRY 41)
AND
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH

---

On January 27, 2009, Plaintiff Tia Johnson filed a pro se complaint against Defendant Memphis City Schools ("MCS"), alleging she was subjected to discrimination, harassment, retaliation, and a hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., 42 U.S.C. § 1981,[1] the Tennessee Human Rights Act, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution, and 28 U.S.C. § 1331. (Docket Entry ("D.E.") 1, p. 1, para. 1.) On June 26, 2009, MCS filed an answer to the complaint. (D.E. 7.) On August 17, 2009, Plaintiff filed an

---

[1] Plaintiff's claims under 42 U.S.C. § 1981 were dismissed on June 4, 2009, because Johnson failed to allege that Defendant discriminated against her on the basis of her race. (See Docket Entry ("D.E.") 3, Order of Partial Dismissal, p. 7.) Forty-two U.S.C. § 1981, prohibits racial discrimination in the making and enforcing of private contracts. Although Plaintiff's amended complaint filed on August 17, 2009 (D.E. 13), includes 42 U.S.C. § 1981 as a jurisdictional basis, it also fails to allege that Defendant discriminated against her on the basis of her race. Because there are no allegations in the record supporting a conclusion that MCS discriminated against Plaintiff on the basis of her race, there is no basis for reconsideration of the earlier dismissal of claims under 42 U.S.C. § 1981 and the issue will not be further addressed.

amended complaint. (D.E. 13.) On November 9, 2009, MCS filed an answer to the amended complaint. (D.E. 25.)

On February 15, 2010, MCS filed a motion for summary judgment, memorandum in support, and exhibits.[2] (D.E. 41.)  Plaintiff filed an initial response to the motion for summary judgment on March 16, 2010 (D.E. 45), and an amended response on April 8, 2010. (D.E. 48.) On April 15, 2010, MCS filed a motion for leave to file a reply brief, with attached reply brief. (D.E. 49.)  The Court granted Defendant's motion to file a reply on April 16, 2010. (D.E. 52.)

Summary judgment is appropriate "if . . . there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Supreme Court has explained:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (citation omitted).

When ruling on a motion for summary judgment the court may consider "pleadings, depositions, answers to interrogatories, and

---

[2]     On May 10, 2010, MCS filed the deposition of Betty Parks and exhibits to her deposition as an additional exhibit to the motion for summary judgment. See D.E. 53.

admissions on file, together with the affidavits." "  Fed. R. Civ.
P. 56(c).   Under Fed. R. Civ. P. 56(e)(2), "[w]hen a motion for
summary judgment is properly made and supported, an opposing party
may not rely merely on allegations or denials in its own pleading;
rather, its response must — by affidavits or as otherwise provided
in this rule — set out specific facts showing a genuine issue for
trial."  In considering a motion for summary judgment, "the evidence
as well as the inferences drawn therefrom must be read in the light
most favorable to the party opposing the motion." Kochins v. Linden-
Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986); see also
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-
88 (1986)(same).

     When ruling on a motion for summary judgment the court may
consider "pleadings, depositions, answers to interrogatories, and
admissions on filed, together with the affidavits." "  Fed. R. Civ.
P. 56(c).  "Other exhibits may be admitted into evidence and
considered if the exhibits are properly authenticated and attached
to an affidavit." Woodruff v. National Life Ins. Co., 2006 WL 2792204
(E.D. Tenn. 2006)(citing Guzman v. Denny's Inc., 40 F. Supp.2d 930,
935 n. 3 (S.D. Ohio 1999)).  "To be considered on summary judgment,
documents must be authenticated by and attached to an affidavit made
on personal knowledge setting forth such facts as would be admissible
in evidence or a deposition that meets the requirements of Federal
Rule of Civil Procedure 56(e). Documents which do not meet those
requirements cannot be considered by the court." Stuart v. Gen.
Motors Corp., 217 F.3d 621, 635 n. 20 (8th Cir. 2000); see also Woods
v. City of Chicago, 234 F.3d 979, 988 (7th Cir. 2000)(a court may

consider "properly authenticated and admissible documents or exhibits" when evaluating a summary judgment motion); 10A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice & Procedure, § 2722, at 379-80 & 382-84 (1988)("Rule 56(e) requires that sworn or certified copies of all papers referred to in an affidavit must be attached to or served with that affidavit... To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence.").[3]

A genuine issue of material fact exists "if the evidence [presented by the non-moving party] is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also id. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict[.]"); Matsushita, 475 U.S. at 586 ("When the

---

[3]    Documents submitted which do not comply with the requirements of Rule 56(e) must be disregarded. See Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 968-69 (6th Cir. 1991); State Mutual Life Assurance Co. of America v. Deer Creek Park, 612 F.2d 259, 264 (6th Cir. 1979). Plaintiff's response to MCS' motion for summary judgment includes random deposition pages, emails, letters, school policies, and time sheets. The documents are offered without any supporting affidavit or deposition to verify their authenticity. Although random pages of Betty Parks deposition are attached to Plaintiff's response, the exhibits do not appear to correspond to the deposition testimony and are not otherwise verified or authenticated. The Court has reviewed the documents despite the fact that the documents were not properly authenticated.

moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (footnote omitted).  The Court's function is not to weigh the evidence, judge credibility, or in any way determine the truth of the matter.  Liberty Lobby, 477 U.S. at 249. Rather, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.

I.   Relevant Facts

The relevant facts follow:[4]

Background

1.   Tia Johnson is an African American female, a citizen of the United States currently residing in Shelby County, Tennessee, and was a resident of Shelby County, Tennessee when these events occurred. See (Pl.'s Dep. Ex. 62, Plaintiff's first EEOC Charge.)

2.   Memphis City Schools is a school district organized under

---

[4]   Local Rule 7.2(d)(3), provides,

the opponent of a motion for summary judgment who disputes any of the material facts upon which the proponent has relied pursuant to subsection (2) above shall respond to the proponent's numbered designations, using the corresponding serial numbering, both in the response and by affixing to the response copies of the precise portions of the record relied upon to evidence the opponent's contention that the proponent's designated material facts are at issue.

Plaintiff has filed objections to the Defendant's statement of material facts. The objections refer to exhibits without attaching them or referencing where the exhibits may be found; other objections consist merely of explication and argument. Plaintiff's initial response to the motion for summary judgment includes unverified random exhibits and random pages from Betty Parks' deposition. The Court has attempted to construe the undisputed facts from Plaintiff's verified complaint, the affidavits, Plaintiff's deposition testimony and verified exhibits, Betty Parks' deposition and verified exhibits, which are provided as exhibits to Defendant's motion and reply.

the Private Acts of Tennessee of 1866-69, as amended.

3.  Plaintiff has worked for the Memphis City Schools since October 1997, currently as a Records Clerk and formerly as a General Office Secretary ("GOS") at several different schools. (Pl.'s Dep. 29:4 - 33:8.)

4.  Plaintiff was employed by MCS as a GOS at Riverview Middle School when these events occurred. Plaintiff is now employed by MCS at Wooddale High School. (Pl.'s Dep. 31:24 - 32:23.)

5.  Plaintiff played an integral role on the administrative team at Riverview and her work duties included answering the school telephone, greeting and interacting with parents and inputting student and other data into school computers. (Pl.'s Dep. 55:1 - 58:13; Pl.'s Dep. Ex. 7.)

6.  There were only two office secretaries at Riverview during the 2007-2008 and 2008-2009 school years. Because of their respective workloads, it was very important for all office employees to report to work on time everyday. When an employee was going to be late or absent, the employee was responsible for notifying the principal so that the principal could make appropriate arrangements. (Parks' Aff.; Pl.'s Dep. Ex. 59.)

7.  When office secretaries are late or absent, it disrupts the office because other employees, including the principal and other administrators, must perform many of the secretaries' work duties. (Pl.'s Dep. Ex. 17, 59; Parks' Dep. Jan. 11, 2010, 23:11-12; Parks' Aff.)

8.  During the 2007-2008 and 2008-2009 school year, Plaintiff's regularly scheduled work hours were from 7 a.m. until 3 p.m. (Pl.'s Dep. 78:2-4, Ex. 7.)

9.  Throughout her employment, Plaintiff has been required to sign in and sign out using the school sign-in sheet located on the front counter. Due to her demanding workload, Parks did not closely monitor the sign-in and sign out process. Instead, she expected her employees to provide accurate sign in and sign out information. (Parks' Dep. 86:21 - 87:17.) Plaintiff has admitted that she sometimes waited until the end of the week to enter her attendance on the sign-in sheet. (Pl.'s Dep., Ex. 57.)

10. The Board of Education for the Memphis City Schools has promulgated an employee attendance policy. Under the policy, employees must maintain a 95% attendance rate. Employees who fail to adhere to this policy are subject to disciplinary action. (Parks' Aff. at para. 11.)

<u>Plaintiff's Attendance and Performance</u>

11.  Plaintiff has a long, documented history of problems with job performance, professionalism, and attendance which date back to 2001. <u>See</u> <u>e.g.</u>, (Pl.'s Dep. Ex. 2, 3, 4, 5.)

12.  During the 2000-01 school year, Plaintiff worked as a GOS at Hamilton High School under Principal Osceloa Hicks ("Hicks"). (Pl.'s Dep. 30:12 - 31:3; 36:16-18.)

13.  During the 2000-01 school year, Plaintiff was absent for 88 of 220 work days and had an attendance rate of 60%. (Pl.'s Dep. Ex. 6.)

14.  Hicks formally reprimanded Plaintiff in writing on three occasions: 4/5/01, 4/9/01, and 6/12/01. The reprimands documented and described the recurring problems with Plaintiff's job performance, professionalism, and attendance. (Pl.'s Dep. 39:11 - 47:4, Ex. 2-4.)

15.  Hicks initially wrote Plaintiff up on April 5, 2001 after she failed to return to work for two weeks, without notice, following the conclusion of her approved leave of absence. (Pl.'s Dep. 39:11 - 42:12, Ex. 2.)

16.  In the April 5, 2001 write up, Hicks indicated that he was "disappointed in [Plaintiff's] performance," and that he had "expressed [his] feelings in this vein to [Plaintiff] before." (Pl.'s Dep. 39:11 - 42:12, Ex. 2.)

17.  On April 9, 2001, Hicks wrote Plaintiff up for the second time in five days for insubordination when she brought her children to work with her after he directed her not to do so. In the write up, Mr. Hicks indicated that Plaintiff's attitude "was extremely unprofessional as it has been for the very short period you have worked this year." (Pl.'s Dep. 42:13 - 45:24, Ex. 3.)

18.  Two months later, Hicks wrote Plaintiff up again for leaving work without permission and without properly noting her departure time on the sign-out sheet. (Pl.'s Dep. 46:2-24, Ex. 4.)

19.  Hicks issued Plaintiff an overall rating of "unsatisfactory" for the 2000-01 school year on her annual performance appraisal. (Pl.' s Dep. 49:15 - 51:12, Ex. 6.)

20.  On June 27, 2001, Plaintiff had a conference with the Division of Personnel Services, at Hicks' request. Following the meeting, the Division of Personnel Services reassigned Plaintiff to another work location. (Pl.'s Dep. 47:6 - 49:14, Ex. 5.)

Plaintiff's Attendance and Perfomance at Riverview

21. During the 2006-07 school year, Plaintiff was assigned to Riverview Middle School under the supervision of Principal Keith Sanders ("Sanders"). (Pl.'s Dep. 32:3-10; Parks' Dep. 93:8 - 94:6; Parks' Aff. at para 2.)

22. During the 2006-07 school year, Plaintiff was absent for 23 of 220 work days, and had an attendance rate of 90%. See (Pl.'s Dep. Ex. 9; Parks' Dep. Ex. 6.)

23. MCS assigned Betty Parks ("Parks") to serve as the principal at Riverview Middle school for the 2007-2008 school year. Plaintiff admits that Parks cares about her students and is a "stickler" for all MCS policies and procedures and requires all of her employees to follow the rules. (Pl.'s Dep. 53:16 - 54:24; Parks' Aff at para. 2.)

24. Before she began her assignment at Riverview, Parks met with the outgoing principal, Keith Sanders. Sanders advised Parks that Plaintiff had an attendance problem. (Parks' Dep. 93:8 - 94:6; Parks' Aff. at para. 2.)

25. During the 2007-08 school year, Plaintiff was absent for at least 26 of 220 work days, and had an attendance rate of 88%. See (Pl.'s Dep. Ex. 9, 23, 24; Parks' Dep. Ex. 6.)

26. Initially, Parks attempted to informally address Plaintiff's attendance problems but Plaintiff's attendance did not improve. As a result, Parks began to formally document Plaintiff's attendance problems in writing. (Parks' Aff. at paras. 4,5,9; Pl.'s Dep. Ex. 17.)

27. On September 28,2007, Plaintiff missed work and failed to secure a substitute in her absence. Parks issued Plaintiff a written reprimand for this incident. In the reprimand, Parks noted that she had been understanding in the past when Plaintiff needed to "leave, come in late or not show up at all for whatever reason." She also advised Plaintiff that her failure to address her attendance problems would lead to further disciplinary action. (Pl.'s Dep. Ex. 10; Parks' Aff. at para. 5.)

28. On October 3, 2007, Plaintiff was tardy to work. Parks documented the tardy arrival with a written job discrepancy notice. (Pl.'s Dep. Ex. 11.)

29. On October 30, 2007, Plaintiff advised Parks that she intended to leave work at 10:00 am for her child's doctor's appointment. Parks expected Plaintiff to return to work after the appointment, but Plaintiff failed to return to work for the remainder of the school day with no notice to Parks. Parks documented the absence in a memo to

Plaintiff on October 30, 2007. (Pl.'s Dep. 104:8 - 105:2, Ex. 12, 13; Parks' Aff. at para. 6.)

30. On November 21 and 22, 2007, Plaintiff was absent from work for personal reasons. (Pl.'s Dep. 105:3 -106:10, Ex. 14.)

31. On December 6, 2007, Plaintiff missed work again. (Pl.' s Dep. 106:16 107:6, Ex. 15.)

32. On February 28, 2008, Plaintiff requested another day off for personal reasons. (Pl.'s Dep. 107:12-22, Ex. 16.)

33. On March 3, 2008, Plaintiff's grandmother passed away. Plaintiff spoke with Parks via telephone to request leave for March 4, 2008. (Pl.'s Dep. 125:2-9; Parks' Aff. at para. 8.)

34. Plaintiff was absent from work on March 4, 2008. (Pl.'s Dep. 125:2-9; Parks' Aff. at para. 8.)

35. Plaintiff was late to work on March 5, 2008. When she arrived to work, Parks issued Plaintiff a written reprimand concerning "tardiness, excessive absences, and other concerns." Parks indicated that Plaintiff had been tardy on March 5, and that she had "given [Plaintiff] several verbal reminders and one prior written warning concerning tardiness and absenteeism," and that "when [Plaintiff is] consistently tardy, or habitually absent, it creates problems for the front office." Parks also implored Plaintiff to "[p]lease make every effort to correct this pattern before it becomes a matter that will negatively impact your employment." (Pl.' s Dep. 108:4 - 111 :24, Ex. 17; Parks' Aff. at para. 9.)

36. Parks also listed several other areas of her concern with Plaintiff's job performance. The list included:
   • Several students having missing grades on report card
   • Incomplete student records in SMS
   • Playing games on the computer during the work day
   • Not calling parent link after the homeroom attendance is turned in
   • Not distributing mail daily
   • Organize and file registration materials
   (Pl.'s Dep. 108:4 - 111:24, Ex. 17.)

37. Parks also notified Plaintiff that she intended to document each and every future instance of tardiness or absence. Specifically, Parks noted in the March 5, 2008 written reprimand that "this memorandum will go in your file today and every time in the future you are tardy." (Pl.'s Dep. Ex. 17; Parks' Aff. at para. 9.)

38. Parks also sent Plaintiff home for the remainder of the day. (Pl.'s Dep. 125:10 - 126:9.)

39. On the same day that she received the March 5, 2008 reprimand, Plaintiff contacted the MCS Department of Labor Relations and complained about Parks' handling of her bereavement leave request. (Pl.'s Dep. 125:18 - 126:4.)

40. Labor Relations advised Parks that she could not send Plaintiff home without pay. Plaintiff testified that she believes that Parks became angry with her because she complained to Labor Relations about her bereavement leave. (Pl.'s Dep. 125:18 - 126:4.)

41. According to Plaintiff, as a result of her complaints regarding bereavement leave, Parks started writing her up more frequently in an effort to get her fired. (Pl.'s Dep. 124:6 - 126:4.)

42. Even after receiving the March 5, 2008 reprimand, Plaintiff missed seven more days of work in March 2008. Plaintiff was absent on March 6 and 7 for additional bereavement leave. She was late on March 10. She then failed to show up for work on March 17, 18, 19, and 24 without any notice to Parks. Plaintiff was also absent on March 27 and she left work early on March 31. (Pl.'s Dep. 112:12 - 119:23, Ex. 9, 18, 19, 20; Parks' Aff. at para. 10.)

43. Plaintiff missed a total of 9 of the 21 work days in the month of March 2008, bringing her attendance rate for the month to 57%. (Pl.'s Dep. 112:12 119:23, Ex. 9, 17, 18, 19, 20; Parks' Aff. at para. 10.)

44. On March 24, 2008, Parks issued Plaintiff a written reprimand because Plaintiff failed to notify her of the absences, either in advance or after her return. In the reprimand, Parks noted that she had "asked [Plaintiff] on several occasions to let me know when [Plaintiff is] going to be absent," and that Plaintiff's failure to do so was "a matter of professionalism and responsibility." (Pl.'s Dep. Ex. 19; Parks' Aff. at para. 10.)

45. On April 10, 2008, Plaintiff left work early. (Pl.'s Dep. 119:24 - 120:12, Ex. 21.)

46. On May 1, 2008, Plaintiff was absent. (Pl.'s Dep. 120:18 - 121:4, Ex. 22.)

47. On May 12, 2008, Parks wrote Plaintiff up again, further documenting Plaintiff's serious attendance issues. Parks indicated that since her previous conversation with Plaintiff regarding Plaintiff's attendance, she had "seen

10

little or no improvement in [Plaintiff's] attendance." (Pl.'s Dep. 121:10 - 123:13, Ex. 22.)

48. The Memphis City Schools' Department of Labor Relations held a disciplinary conference with Plaintiff on May 27, 2008 to discuss Plaintiff's excessive tardiness and absenteeism. (Pl.'s Dep. 126:9 - 128:17, Ex: 24.)

49. As a result of the May 27, 2008 Labor Relations conference, the Labor Relations Department suspended Plaintiff for five days without pay. (Pl.'s Dep. 126:9 - 128:17, Ex. 24; Parks' Aff. at para. 11.)

50. On July 1, 2008, Plaintiff filed a grievance regarding her five day suspension. The grievance alleged that Parks violated the "preamble, article 30, nondiscrimination, discipline and discharge" clauses of the CBA. Plaintiff did not provide any other information regarding the basis of her grievance. (Pl.'s Dep. 128:23 - 129:16, Ex. 25; Parks' Aff. at para. 12.)

51. On August 25, 2008, Labor Relations reduced the suspension to a documented counseling session under the collective bargaining agreement. (Pl.' s Dep. 129:17 -131:3, Ex. 26.)

52. On July 30, 2008, Plaintiff was absent to attend an out-of-town church conference. (Pl.'s Dep. 131:24 -133:8, Ex. 27.)

Documentation of Plaintiff's Attendance and Performance in 2008-09

53. During the 2008-09 school year, Plaintiff was absent for 26 of 215 work days and had an attendance rate of 88%. See (Pl.'s Dep. Ex. 9; Parks' Dep. Ex. 6.)

54. On August 13, 2008, Parks reprimanded Plaintiff in writing for not following a directive and for engaging in unprofessional conduct. When Ms. Parks questioned Plaintiff about a task she assigned her Plaintiff "became extremely upset and told Ms. Ware and [Parks] to enter the data" themselves. Plaintiff then informed Parks that she intended to quit her job, although she later changed her mind. (Pl.'s Dep. 136:5 - 141:16, Ex. 28; Parks' Aff. at para. 13.)

55. On August 27, 2008, Parks reprimanded Plaintiff in writing again because of her continuing attendance and job performance problems. (Pl.'s Dep. 142:8 - 150:18, Ex. 29; Parks' Aff. at para. 13.)

56. On August 28, 2008, Plaintiff arrived at work late. (Pl.'s Dep. 150:19 - 154:15, Ex. 30, 31; Parks' Aff. at para. 13.)

11

57.  Parks directed Plaintiff to come to her office, but Plaintiff ignored the request and walked away. Parks found Plaintiff and again directed her to come to her office. Plaintiff conceded that she had been tardy, but blamed it on traffic. Plaintiff then asked, "is that all you wanted?" in what Parks considered to be a "very disrespectful tone." Parks noted Plaintiff's insubordination in a written reprimand. She also issued a job discrepancy notice to document the tardy arrival. (Pl.'s Dep. 150:19 - 154:15, Ex. 30.)

58.  Plaintiff requested a vacation day for October 10, 2008, and Parks denied the request. Plaintiff was absent October, 10, 2008. Parks reprimanded Plaintiff for her absence. (Pl.'s Dep. 154:16 - 157:10, Ex. 32; Parks' Aff. at para. 13.)

59.  Plaintiff left work early on October 15, 2008 to take her child to the doctor, despite Parks' request that doctors appointments be made after school hours. Parks reprimanded Plaintiff for leaving early. (Pl.'s Dep. Ex. 32; Parks' Aff. at para. 13.)

Plaintiff Files Charge of Discrimination with EEOC

60.  Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunities Commission ("EEOC") on October 21, 2008. In the Charge, Plaintiff alleged that MCS retaliated against her in violation of Title VII because she filed the first grievance in July 2008. (Pl.'s Dep. 237:6 - 242:13, Ex. 62; Parks' Aff. at para. 14.)

61.  Plaintiff indicated in her charge that she understood that the EEOC would not pursue the Charge of Discrimination. (Pl.'s Dep. Ex. 62.)

62.  MCS' Department of Equity Compliance investigates all charges of discrimination against MCS. (Parks' Aff. at para. 14.)

63.  The EEOC closed the file on Plaintiff's first EEOC claim on October 27, 2008, just six days after it was filed, with a no-cause determination. (Pl.'s Dep. 242:14 - 243:14, Ex. 63.)

64.  Because the EEOC closed Plaintiff's file so quickly with a no-cause determination, the Office of Equity Compliance never investigated Plaintiff's claims and never notified Parks that Plaintiff had filed a charge against her. (Parks' Aff. at para. 14.)

65.  Parks was not aware that Plaintiff filed the charge with the EEOC until the end of the 2008-2009 school year.

(Parks' Aff. at paras. 14, 15; Parks' Dep. 95:16 - 96:21.)

66. Plaintiff contends that she notified Parks of the EEOC charge on December 15, 2008, when she referred to it in an email to Parks. Parks received the email, but at that time Parks was unaware that the EEOC charge mentioned by Plaintiff was separate from the earlier grievance brought by Plaintiff through her union. (Parks' Aff. at para. 15; Parks' Dep. Ex. 35.)

Plaintiff's Attendance and Perfomance After Filing Charge

67. Plaintiff's attendance issues continued after she filed her charge. Plaintiff was late to work for three consecutive days on November 17, 18, and 19. Ms. Parks documented the tardy arrivals in a written job discrepancy notice. (Pl.'s Dep. 159:14 - 161:8, Ex. 35.)

68. On December 8, 2008, Plaintiff was absent from work and failed to call in and notify Parks of her absence. On December 9, 2008, Parks reprimanded Plaintiff for the "no-call, no-show" and she also documented two additional tardy arrivals, on December 5 and December 9. (Pl.'s Dep. 161:10 - 162:23, Ex. 36.)

69. Despite receiving a written reprimand for poor attendance and punctuality the day before, Plaintiff was late to work on December 10, 2008. Ms. Parks issued her a written job discrepancy notice to Plaintiff on December 11, 2008, to document the tardy arrival. (Pl.' s Dep. 163:5 - 165:8, Ex. 37.)

70. The very next day, Plaintiff emailed Parks and requested that she be allowed to leave work early on December 12 at 1:00 for a doctor's appointment. Parks told Plaintiff that, as she had been instructed before, she was to schedule doctor's appointments for after school hours. (Pl.'s Dep. 165:14 - 169:14, Ex. 38.)

71. Plaintiff was late to work on December 12, 2008. Plaintiff subsequently left work at 1:00 for her appointment, in direct violation of Ms. Parks' instructions. (Pl.'s Dep. Ex. 38, 39.)

72. On December 15, 2008, Plaintiff emailed Parks to request two additional vacation days on December 22 and 23 to extend her winter holiday break. Parks granted the request. (Pl.'s Dep. 171:1-17, Ex. 40.)

73. On January 2, 2009, Plaintiff failed to report to work for the first day back from the winter holiday break, and failed to notify Parks of her absence. Parks documented this "no show" in a written job discrepancy notice on

January 5, 2009. (Pl.'s Dep. 171:23 -174:19, Ex. 41.)

74. On February 6,2009, Parks issued Plaintiff another written reprimand for her attendance. In the reprimand, Parks documented that Plaintiff had been tardy all five days that week. Parks also noted that Plaintiff had been absent three days the previous week (January 28 - 30), even though Parks had only approved one day (January 28) as a vacation day. (Pl.'s Dep. 185:6 -188:19, Ex. 44.)

75. Plaintiff was late to work February 2, 3, 4, 5, 6, and 9, 2009. (Pl.'s Dep. 188:20 -190:9, Ex. 45.)

76. On February 11, 2009, Parks and Plaintiff had a conference in which Parks addressed three problems she was having with Plaintiff's job performance: tardiness, Plaintiff's handling of parent visitation procedures, and Plaintiff's handling of legal documents. (Pl.'s Dep. 188:20 - 195:8, Ex. 45.)

77. On February 17, 2009, Plaintiff left work early and she did not report to work on February 18, 2009. (Pl.'s Dep. 195:17 - 198:1, Ex. 46.)

78. On February 19, 2009, Parks attempted to meet with Plaintiff to sign some attendance documents. Plaintiff refused to meet with Parks and stated that "I am not going to sit down, be in another meeting, or sign that form." On February 20, 2009, Parks documented the incident in a written reprimand because she considered Plaintiff's behavior to be insubordinate and disrespectful. (Pl.'s Dep. 198:2 - 201:13, Ex. 47.)

79. On February 20, 2009, Parks issued Plaintiff another written reprimand for continuing attendance problems. The reprimand noted that Plaintiff was absent from work on February 20, and that, although Plaintiff's cellular phone number appeared on Parks' caller identification twice on that morning, Plaintiff failed to speak with anyone or leave a voice mail message notifying Parks of her absence. (Pl.'s Dep. 201:14 - 203:19, Ex. 48.)

80. On February 27, 2009, Parks issued Plaintiff a written job discrepancy notice, documenting Plaintiff's tardy arrivals to work for three days in a row, on February 25-27, and her unauthorized early departure from work on February 25. (Pl.'s Dep. 203:20 - 205:3, Ex. 49.)

81. On March 10,2009, Ms. Parks issued Plaintiff a memo listing several areas of job performance in which Plaintiff needed to improve. The list included
   • Answering the phone
   • Delivering phone messages

- Greeting parents
- Dealing with students in the office
- Filing report cards and registration
- Distributing mail
- Conducting personal business during the workday
- Poor attendance
- Calling parents when students are absent
- Lack of communication
- Printing report cards and progress reports
- Entering and filing discipline

(Pl.'s Dep. 207:6 - 211:22, Ex. 51.)

82.  Plaintiff was absent from work from March 25 to March 27,2009. (Pl.'s Dep. 212:4 - 213:15, Ex. 52, 53.)

83.  On April 9, 2009, Parks issued Plaintiff a job discrepancy notice in which she indicated that Plaintiff had been tardy to work on April 6 and April 9, 2009. (Pl.'s Dep. 214:14 - 215:17, Ex. 55.)

84.  On April 14, 2009, Parks issued Plaintiff a detailed memo detailing "major issues [that Plaintiff] refuse[s] to address after several verbal reminders and memos." The memo included documentation of attendance problems, including a listing of four additional tardy arrivals; problems with Plaintiff choosing not to sign in for the day upon arrival at work; a dangerous situation in which Plaintiff allowed an unauthorized parent to check out a student; and problems with Plaintiff reading personal materials while on the clock. (Pl.'s Dep. 215:23 - 221:4, Ex. 56.)

85.  Parks referred Plaintiff to the Memphis City Schools Department of Labor Relations for the second time on April 21, 2009 for infractions including releasing a student to someone not on the student's contact list, allowing an unescorted parent to enter a classroom, and consistent tardiness. (Pl.'s Dep. 224:3 - 233:12, Ex. 58.)

86.  The Department of Labor Relations held a conference with Plaintiff on April 22, 2009. As a result of the conference, Plaintiff was suspended for five days without pay. (Pl.'s Dep. 224:3 - 233:12, Ex. 58.)

87.  On May 6, 2009, Plaintiff emailed Parks to request another early departure for a personal doctor's appointment. Parks denied the request via return email, due to Plaintiff's persistent attendance problems and her earlier request that doctor's appointments be scheduled outside of school hours. Parks explained that Plaintiff's absences caused a difficult situation for the school, because when Plaintiff was absent, there was only one secretary to do all the work of two secretaries. (Pl.'s Dep. 233: 18 - 234:4, Ex.

59; Parks' Aff. at para. 3.)

88. Plaintiff filed a second complaint with the EEOC on May 12, 2009, in which she again alleged that Defendant had retaliated against her in violation of Title VII of the Civil Rights Act of 1964. (Pl.'s Dep. 243:14 – 246:3, Ex. 64.)

## II. Legal Analysis

The United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), established a method for evaluating evidence in discrimination cases, where, as here, Plaintiff has no direct evidence of discrimination.[5] That method has been summarized as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reasons for the employee's rejection." . . . Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

<u>Texas Dep't of Comm. Affairs v. Burdine</u>, 450 U.S. 248, 252–53 (1981) (citations omitted).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  <u>Id.</u> at 253.

---

[5]     Plaintiff alleges, but does not provide credible, material evidence of direct discrimination "which, if believed requires a conclusion that unlawful discrimination or retaliation was at least a motivating factor in the [Defendant's] actions" and "does not require a factfinder to draw any inferences" to reach that conclusion. <u>Kocak v. Community Health Partners of Ohio, Inc.</u>, 400 F.3d 466, 470 (6th Cir. 2005). "Evidence of discrimination is not considered direct evidence unless a[n improper] motivation is explicitly expressed." <u>Amini v. Oberlin College</u>, 440 F.3d 350, 359 (6th Cir. 2006). Because the Court's review of the record finds no material evidence of direct discrimination, the Plaintiff must establish a <u>prima facie</u> case of discrimination pursuant to the <u>McDonnell Douglas</u> formulation from which a discriminatory motive may be inferred.

A.   <u>Retaliation</u>

The same burden shifting analysis set forth in <u>McDonnell Douglas</u> applies to claims of retaliation. <u>See</u> <u>EEOC v. Avery Dennison Corp.</u>, 104 F.3d 858, 860 (6th Cir. 1997). To establish a <u>prima</u> <u>facie</u> case of retaliation, Johnson must show:

> (1) that [s]he was engaged in activity protected by Title VII; (2) that the defendant knew of this exercise of h[er] protected rights; (3) that the defendant consequently took an employment action adverse to plaintiff; and (4) that there is a causal connection between the protected activity and the adverse employment action.

<u>Stouss v. Michigan Dept. of Corrections</u>, 250 F.3d 336, 342 (6th Cir. 2001); <u>see</u> <u>also</u> <u>Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co.</u>, 783 F.2d 50, 54 (6th Cir. 1986).  Defining "protected activity," Title VII provides, in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees.. because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a), quoted in <u>DiCarlo v. Potter</u>, 358 F.3d 408, 420 (6th Cir. 2004).

Plaintiff alleges in the amended complaint that Principal Parks began disciplining her more frequently after Plaintiff's complaint to Labor Relations about bereavement leave in March 2008. In the response to Defendant's motion for summary judgment, Plaintiff also alleges that after she notified Principal Parks that she filed a charge of discrimination by email sent December 15, 2009, Parks began retaliating against Plaintiff by falsifying Plaintiff's attendance. The record in this case establishes, however, that Parks began

disciplining Plaintiff for attendance problems in September 2007, approximately five months before Plaintiff's initial March 2008 complaint to Labor Relations and over one year before Plaintiff filed her initial charge of discrimination.[6]

Plaintiff was warned as early as September 28, 2007, that "[f]ailure to correct this problem [missing work without securing a sub] will lead to disciplinary action." On March 5, 2008, Parks' disciplined Plaintiff for her tardy arrival on March 5, 2008, by sending her home. At that time, Parks also gave Plaintiff written notification of other areas of concern and Parks' intention to document "every time in the future you are tardy." The record demonstrates that Parks thereafter documented problems with Plaintiff's attendance, arrival time, professionalism, and performance until Plaintiff was transferred to another school in 2009.

In May 2008, Parks referred Plaintiff to Labor Relations for disciplinary action because of Plaintiff's excessive tardiness and absenteeism. Plaintiff was suspended for five days without pay. On July 1, 2008, Plaintiff filed a grievance contesting her punishment and Labor Relations reduced the suspension to a documented counseling session under the collective bargaining agreement. Principal Parks' affidavit states that she was aware of Plaintiff's July 2008 grievance, however, she did not see the grievance and was unaware that Plaintiff referenced the non-discrimination clause in the

---

[6]    It is also clear from the record that Plaintiff's absenteeism was a problem which predated Parks' arrival as her supervisor and existed as early as 2001.

grievance or learn of the reference until Plaintiff was transferred to another school. It was not until October 21, 2008, that Plaintiff filed her first charge of discrimination alleging retaliation. The EEOC closed Plaintiff's file seven days after processing her complaint. On April 21, 2009, Parks referred Plaintiff to Labor Relations a second time and Plaintiff was suspended for five days without pay. Plaintiff filed a second charge of discrimination on May 12, 2009.

Plaintiff contends that Parks was aware of the initial EEOC charge because Plaintiff referred to the charge in an email sent December 15, 2008, stating in part "you are retaliating against me for filing an [sic] charge on you at EEOC." Parks states in her affidavit that when she read the email, she did not understand that Plaintiff had filed a formal charge of discrimination against her with an outside agency and thought Plaintiff was referring to Plaintiff's July 2008 grievance to Labor Relations because no one from the Office of Equity Compliance or MCS' administration contacted her about an EEOC charge.

Plaintiff Johnson presents no affidavits or evidence demonstrating that Parks or MCS knew about her participation in any protected activity. Plaintiff has produced no documents demonstrating that the Office of Equity Compliance investigated her charge of discrimination, that MCS was required to answer the charge, or that MCS' administration notified or interviewed Parks about the charge. Johnson fails to rebut Parks' declaration that Parks assumed Plaintiff's email referred to the July 2008 grievance and that Plaintiff never discussed the EEOC charge with Parks. Plaintiff has

19

failed to establish that Defendant knew of her exercise of a protected right. Plaintiff has not satisfied the second requirement of a <u>prima</u> <u>facie</u> case.

Even if it were assumed that Plaintiff could satisfy the first three elements of a <u>prima</u> <u>facie</u> case, she is unable to establish causation. To establish the fourth, or causal connection, element of a <u>prima</u> <u>facie</u> case of retaliation, Plaintiff must adduce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken if Plaintiff had not engaged in protected activity. <u>Nguyen v. City of Cleveland</u>, 229 F.3d 559, 563 (6th Cir. 2000). "[T]he mere fact that an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim." <u>Balmer v. HCA, Inc.</u>, 423 F.3d 606, 615 (6th Cir. 2005).

The Sixth Circuit has recognized that, to show a causal connection, a plaintiff must show "a temporal connection coupled with other indicia of retaliatory conduct." <u>Little v. BP Exploration & Oil Co.</u>, 265 F.3d 357, 364 (6th Cir. 2001). As stated in <u>Little</u>, there must be other evidence of retaliatory conduct, along with the temporal connection, in order to satisfy the causal connection requirement of a <u>prima</u> <u>facie</u> case of retaliation. <u>Little</u>, 265 F.3d at 364. In <u>Little</u>, Little's co-workers testified that they were asked to make false claims of theft and harassment against Little or they would lose their jobs. <u>Id.</u> at 365.

In this case, Plaintiff cannot demonstrate that she was not disciplined for legitimate reasons, e.g. excessive absences,

20

tardiness, and insubordination. Plaintiff was disciplined and counseled repeatedly both before and after her protected activity. Plaintiff failed to correct any cited deficiency. Plaintiff's work record is, quite simply, appalling. Plaintiff has not presented sufficient evidence from which a reasonable juror could conclude that a causal connection exists between her discipline and her protected activity.

Plaintiff has failed to establish a <u>prima</u> <u>facie</u> case of retaliation. Plaintiff's allegations do not create a genuine issue of material fact, and Defendant is entitled to judgment as a matter of law.

B.   <u>Hostile Work Environment</u>

The elements of a Title VII hostile work environment claim are as follows:

> 1) the employee was a member of a protected class; 2) the employee was subjected to unwelcome harassment; 3) the harassment complained of was based upon [membership in a protected class]; 4) the harassment had the effect of unreasonably interfering with the plaintiff's work performance by creating an intimidating, hostile, or offensive working environment; and 5) there is some basis for employer liability.

<u>Russell v. University of Toledo</u>, 537 F.3d 596, 608 (6th Cir. 2008)); <u>Clay</u>, 501 F.3d at 706.

"Actionable harassment exists if 'the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Farmer v. Cleveland Public Power</u>, 295 F.3d 593, 604 (6th Cir. 2002) (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993));

Williams v. General Motors Corp., 187 F.3d 553, 560 (6th Cir. 2001).
The standard for whether an employee has been subjected to a hostile
work environment has both an objective and a subjective component.
Newman v. Federal Express Corp., 266 F.3d 401, 405 (6th Cir. 2001).

There is no Title VII violation if the conduct at issue "is not
severe or pervasive enough to create an objectively hostile work
environment—an environment that a reasonable person would find
hostile or abusive." Harris, 510 U.S. at 21.[7]

> [W]hether an environment is "hostile" or "abusive" can be
> determined only by looking at all the circumstances. These
> may include the frequency of the discriminatory conduct;
> its severity; whether it is physically threatening or
> humiliating, or a mere offensive utterance; and whether it
> unreasonable interferes with an employee's work
> performance.

Id. at 23; see also Oncale v. Sundowner Offshore Servs., Inc., 523
U.S. 75, 81-82 (1998) (recognizing the necessity of applying
"[c]ommon sense" and "an appropriate sensitivity to social context").
As the Supreme Court states in Faragher v. City of Boca Raton, 524
U.S. 775 (1998), Title VII is not meant to be a "general civility
code." Id. at 788.

Johnson alleges that her complaints to Labor Relations establish
she was subjected to intimidating, hostile, offensive, and depressing
work conditions. Johnson contends Parks' "went overboard in her job"
and Parks' actions in disciplining her created a hostile work
environment. There is no evidence before the Court which demonstrates
that Johnson was harassed based upon her membership in a protected

---

[7] "Likewise, if the victim does not subjectively perceive the environment
to be abusive, the conduct has not actually altered the conditions of the victim's
employment, and there is no Title VII violation." Id. at 21-22.

22

class. Johnson has not filed any affidavit which establishes that she was treated differently than any other employee who was consistently tardy, absent, or insubordinate.  Furthermore, the Sixth Circuit has emphasized that conversations between an employee and his superiors about that employee's job do not rise to the level of harassment "simply because they cause the employee distress." <u>Keever v. City of Middletown</u>, 145 F.3d 809, 813 (6th Cir. 1998).  Simply stated, extensive analysis is not required to reach the conclusion that the cited incidents did not constitute the type of sufficiently severe or pervasive hostile work environment to alter the conditions of Johnson's employment.

Johnson has failed to establish a <u>prima</u> <u>facie</u> claim that she was subjected to a hostile work environment during her employment at Riverview, and Defendant is entitled to judgment as a matter of law.

C.   <u>Claims Based on Race, Creed, Color, Religion, Sex, Age, and/or National Origin</u>

Plaintiff's complaint and amended complaint allege in conclusory fashion "discriminatory practice" by MCS which violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-401(a).  MCS contends that Plaintiff failed to exhaust her administrative remedies on any claim of race, creed, color, religion, sex, age, and/or national origin claims and such claims would exceed the scope of her charge. Plaintiff's response did not address this portion of Defendant's response, therefore, to the extent Plaintiff sought to assert such claims, she now appears to have abandoned them.

Generally, "[i]n order for federal courts to have subject matter

jurisdiction of [employment discrimination] claims, the claimant must first unsuccessfully pursue administrative relief." <u>Ang v. Proctor & Gamble Co.</u>, 932 F.2d 540, 545 (6th Cir. 1991); <u>see also</u> <u>Zipes v. Trans World Airlines</u>, 455 U.S. 385, 393 (1982); <u>Parry v. Mohawk Motors, Inc.</u>, 236 F.3d 299, 308 (6th Cir. 2000) (Title VII exhaustion requirements applicable to ADA claims).  An aggrieved person in a deferral state such as Tennessee must file a formal charge of discrimination with the EEOC or the Tennessee Human Rights Commission within three hundred (300) days of the allegedly discriminatory action, 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(2),[8] and must commence a civil action within ninety (90) days of receipt of the right to sue letter, 42 U.S.C. § 2000e-5(f)(1); 29 U.S.C. § 626(e).

To the extent, Plaintiff contends that Defendant discriminated against her on the basis of race, color, sex, religion, national origin, age, or disability, her claims are unexhausted and barred by her failure to file a charge within three hundred (300) days of the allegedly discriminatory action.  For these reasons, Defendant is entitled to judgment as a matter of law on any claims of race, color, sex, religion, nation origin, age, or disability.

D.   <u>Claims Under the Fifth and Fourteenth Amendments</u>

The Court construes Plaintiff's citation to the Fifth and Fourteenth Amendments of the United States Constitution as an attempt to state a claim under 42 U.S.C. § 1985. Although the complaint does

---

[8]     The Supreme Court held in <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 110 (2002), that "[a] discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.' A party, therefore, must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it."

not specify which of the three subsections of § 1985 is at issue, Plaintiff must intend to rely on 42 U.S.C. § 1985(3). In order to maintain a claim under § 1985(3), a plaintiff must demonstrate that the defendants (1) conspired together, (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws, (3) and committed an act in furtherance of the conspiracy, (4) which caused injury to person or property, or a deprivation of any right or privilege of a citizen of the United States, and (5) and that the conspiracy was motivated by racial, or other class-based, invidiously discriminatory animus. Bass v. Robinson, 167 F.3d 1041, 1050 (6th Cir. 1999)(citing Griffin v. Breckenridge, 403 U.S. 88, 102-03 (1971); see also Johnson v. Hills & Dales Gen. Hosp., 40 F.3d 837, 839 (6th Cir. 1994). There are no allegations in the complaint that "the conspiracy was motivated by racial, or other class-based, invidiously discriminatory animus." Therefore, a vital component to the conspiracy claim is missing.

Factual allegations must be enough to raise a right to relief above the speculative level. See 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004). Plaintiff's obligation to provide the "grounds" of her "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. See Papasan v. Allain, 478 U.S. 265, 286 (1986). These conclusory allegations are devoid of the material facts necessary to support a claim of conspiracy by Defendant MCS and Defendant is entitled to judgment as a matter of law.

    E.   Claims Under the Eighth Amendment

Plaintiff cited the Eighth Amendment of the United States Constitution as a jurisdictional basis for her lawsuit. The complaint does not state a valid claim under the Eighth Amendment. It is unclear why Plaintiff believes the Eighth Amendment would be applicable. That amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." U.S. Const., amend. VIII. Plaintiff is not a prisoner and, therefore, the Eighth Amendment is inapplicable and Defendant is entitled to judgment as a matter of law.

Defendant MCS's motion for summary judgment (D.E. 41) is GRANTED in its entirety. Accordingly, the Court DISMISSES Plaintiff's complaint.

III. <u>Appellate Issues</u>

The Court must also consider whether Plaintiff should be allowed to appeal this decision <u>in</u> <u>forma</u> <u>pauperis</u>, should she seek to do so. The Court of Appeals requires that the district court determine, in all cases where the appellant seeks to proceed <u>in</u> <u>forma</u> <u>pauperis</u>, whether the appeal is frivolous. <u>Floyd v. United States Postal Serv.</u>, 105 F.3d 274, 277 (6th Cir. 1997).

Pursuant to the Federal Rules of Appellate Procedure, a non-prisoner desiring to proceed on appeal <u>in</u> <u>forma</u> <u>pauperis</u> must obtain pauper status under Fed. R. App. P. 24(a). Rule 24(a)(3) provides that if a party was permitted to proceed <u>in</u> <u>forma</u> <u>pauperis</u> in the district court, she may also proceed on appeal <u>in</u> <u>forma</u> <u>pauperis</u> without further authorization unless the district court "certifies that the appeal is not taken in good faith or finds that the party is not otherwise entitled to proceed in forma pauperis." If the

district court denies pauper status, the party may file a motion to proceed in forma pauperis in the Court of Appeals.  Fed. R. App. P. 24(a)(4)-(5).

The good faith standard is an objective one.  Coppedge v. United States, 369 U.S. 438, 445 (1962).  The test under 28 U.S.C. § 1915(a) for whether an appeal is taken in good faith is whether the litigant seeks appellate review of any non-frivolous issue.  Id. at 445-46. The same considerations that lead the Court to grant Defendant's motion for summary judgment and dismiss this case compel the conclusion that an appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal in this matter by Plaintiff would not be taken in good faith and Plaintiff may not proceed on appeal in forma pauperis. Leave to proceed on appeal in forma pauperis is, therefore, DENIED. If Plaintiff files a notice of appeal, she must also pay the full $455 appellate filing fee or file a motion to proceed in forma pauperis and supporting affidavit in the United States Court of Appeals for the Sixth Circuit within thirty (30) days.

IT IS SO ORDERED this 13th day of May, 2010.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE